# UNITED STATES BANKRUPTCY COURT
# FOR THE
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re:<br><br>Fred Fuller Oil & Propane Co., Inc.<br><br>                              Debtor. | Chapter 11<br>Case No. 14-12188-BAH |

## OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL AND PROVISION OF ADEQUATE PROTECTION

Now comes Sprague Operating Resources, LLC f/k/a Sprague Energy Corp. ("Sprague"), a secured creditor with an interest in cash collateral, and by and through its attorneys, Pierce Atwood LLP, objects to the Debtor's Emergency Motion for Order Authorizing Use of Cash Collateral and Provision of Adequate Protection [Dkt. No. 10] (the "Motion") filed by Fred Fuller Oil & Propane Co., Inc. (the "Debtor") on November 12, 2014, and states as follows:

### Procedural Background

1.   On November 10, 2014, the Debtor, a large supplier of home heating fuel that services many residents of the State of New Hampshire, commenced this case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code. The Debtor is continuing in possession of its property and operating and managing its business as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.   On November 12, 2014, the Debtor filed its Emergency Motion for Order Authorizing Use of Cash Collateral and Provision of Adequate Protection, seeking on an *ex parte* basis interim authority to use cash collateral in which Sprague has an interest.

{W4579922.2}

**Preliminary Statement**

3. Through its Motion, the Debtor purports to seek authority to use Sprague's cash collateral to fund its business operations in the ordinary course and preserve its value as a going concern for the benefit of its creditors. The Debtor's Budget, however, demonstrates that the business the Debtor seeks to operate post-petition is a significantly pared down version, indeed a fraction of its former self which, according to the Debtor's own projections, will swiftly diminish its inventory, bleed cash, burn through what receivables it has as they are converted into cash, fail to generate sufficient new receivables to maintain future cash flow and, most importantly, fail to service the needs of its residential customers who rely on the Debtor to keep their houses warm as winter fast approaches. If the market is to integrate and serve the needs of these customers, that process should commence now, not weeks hence, when tanks are bare and frigid temperatures prevail and supplies become less available and more costly.

4. Although the Debtor suggests that it might accomplish a sale as a going concern – an event trumpeted as imminent for a long period of time pre-petition – it does not identify any concrete prospect that will promptly close a deal. In the absence of a quick sale or infusion of new value, such as DIP financing, the Debtor's proposed operating model will impair Sprague's security not only by diminishing cash collateral but also by jeopardizing the going concern value of the business itself by destroying what goodwill is left of the business. Accordingly, the Debtor's Motion should properly be denied as the Debtor's hope of reorganization is faint (if not nonexistent) and the Debtor cannot adequately protect Sprague's interest while it pursues that bare hope.

**Sprague's Cash Collateral**

5. Sprague is a Delaware limited liability company engaged in the energy wholesaling business that furnished fuel products to the Debtor prepetition and maintains a security interest in personal property of the Debtor, including its cash, inventory and accounts.

6. The Debtor's obligations to Sprague are memorialized in a Master Distillate and Gasoline Sales Agreement (the "Agreement") dated September 30, 2010, and are secured by personal property of the Debtor under the terms of Security Agreements dated December 21, 2011, December 4, 2012 and January 10, 2014 (collectively, the "Security Agreements").

7. Sprague's security interests embrace the following of the Debtor's properties, assets and rights, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof:

> all personal and fixture property of every kind and nature including without limitation goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including without limitation health-care-insurance receivables and other receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, and any other contract rights, or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including payment intangibles).

*See* Exhibits A–C.

8. As of the filing date, the Debtor's obligations to Sprague totaled approximately $4.7 million. The Debtor estimates the value of Sprague's collateral at $15,000,000 as of the filing date, "including $206,000 in cash, $3,499,400 in accounts receivable, approximately, $500,000 in inventory, long-term leases of its business and distribution facilities and general intangibles, including its customer list." Motion at 5.

**The Budget—A Snapshot of the Debtor's Business Post-Petition**

9. The Debtor's budget reveals some important facts about its intended business post-petition that speak not only to the Debtor's ability to operate the business day-to-day, but also to the Debtor's likelihood of preserving the business's going concern value.

10. First, the Budget demonstrates that the Debtor's sole source of income is receipts from fuel sales. But to make fuel sales, the Debtor must make fuel purchases and the Debtor needs cash to do so. Where the Debtor has not arranged DIP financing, it must rely on cash on hand and proceeds from its accounts receivable to purchase inventory and cover payroll expenses. As demonstrated by the Budget, without financing, the Debtor cannot buy inventory and build up its accounts receivable to spur increased cash flow and, over time, the Debtor's currents assets will be depleted. Indeed, the Budget shows negative cash flow of $109,000 and a decrease in current assets of $289,000 within just two weeks. This is at a time when responsible heating oil retailers must ramp up inventories in order to meet their customers' winter needs.

11. Next, the fuel purchases line item of the Budget evidences that the Debtor is significantly scaling back its operations, a decision that will inevitably result in a majority of regular customer orders going unfilled and, as a consequence, diminish the goodwill of the business. In November 2012 and 2013, the Debtor bought 2,409,435 and 2,389,802 gallons of oil from Sprague, respectively. The Debtor's Budget projects fuel purchases in the amount of $800,000 during the two-week Initial Use Period. Assuming these projections are entirely for heating oil,[1] and carrying them forward for a month, the Debtor projects November purchases at roughly $1,600,000. At the current wholesale price of approximately $2.40 per gallon, the

---

[1] Though, they almost certainly include propane from another supplier.

Debtor will purchase only 666,667 gallons of oil in November, just **28%** of its purchases at this time in 2012 and 2013.

12. Beyond that, topping the Debtor's "List of Creditors Holding 20 Largest Unsecured Claims" is an unidentified group of "CERTAIN CREDITORS OMITTED PENDING COURT ORDER" to whom the Debtor owes **$7,623,461.86**. Included within this group are customers to whom the Debtor made illegal sales of "prepaid contracts," *see* RSA 339:79 [Petroleum Sales Contracts], as well "budget plan" customers. These customers, to whom an extraordinary sum of money is owed, will certainly *not* be paying the Debtor for heating oil deliveries – that is, in the event the Debtor elects, as part of its vastly pared down business model, to service them at all.

13. Finally, the Debtor's Budget, projecting *substantial* losses, is noteworthy for its failure to list a single non-payroll operating expense – that is, for a company that must keep, maintain, insure, and fuel a fleet of more than a hundred vehicles, including fuel oil delivery trucks, lease access to terminal space, and operate offices, including customer service telephony, and, finally, the (to be proposed) $300/hr. fees of a full-time Chief Restructuring Officer.

## Argument

14. The Debtor has no means of financing its operations post-petition other than through use of Sprague's cash collateral. Accordingly, the Debtor seeks authority to make disbursements of up to $1,009,000, with a cumulative variance of 10% to pay its operating costs and expenses over the next two weeks using Sprague's collateral.

15. Absent Sprague's consent, the Debtor may only use cash collateral if it demonstrates that Sprague is adequately protected. *See* 11 U.S.C. § 363(e).

{W4579922.2}                                5

16. Adequate protection may be provided by (i) a single or periodic cash payment to Sprague to the extent of diminution of the value of Sprague's lien by reason of the Debtor's use of cash collateral, (ii) providing additional or replacement liens to the extent the Debtor's use of cash collateral diminishes the value of Sprague's lien or (iii) providing other relief that will result in Sprague's realization of the indubitable equivalent of its interest in the collateral. 11. U.S.C. § 361.

17. The Debtor contends that, because Sprague is oversecured, a sufficient equity cushion exists such that Sprague is adequately protected by the Debtor's provision of replacements liens despite the Debtor's projected negative cash flow over the Initial Use Period.

18. Yet, Sprague's oversecured status and, indeed the very fate of the Debtor's case, hinges precariously on the Debtor's ability to preserve the going concern value of its business pending a sale – something its Budget does not project to happen. Unless the Debtor can preserve the going concern value of the business, this chapter 11 case is destined for failure and the interests of Sprague cannot be adequately protected.

19. According to the Debtor's own projections, it will experience significant negative cash flow during the Initial Use Period. Where receipts from fuel sales constitute the sole source of the Debtor's income and its projections demonstrate that the accounts receivable and inventory (and cash to purchase inventory) used to generate receipts will rapidly decline post-petition, it is beyond unlikely that the Debtor will successfully reorganize or sell the business before its cash dries up entirely, leaving the business inoperable and Sprague undersecured.

20. Although the Debtor indicates that its historic revenues and expenses support its cash flow analysis, it has provided no real insight into that history or into the cash flow the Debtor expects to generate through operation of the business post-petition from which to judge

the value of the replacement liens being given or to assess the overall liquidity of the receivables on which the liens are to be given.  A two-week budget for a substantially pared down business that projects losses, fails to include non-payroll operating expenses (including the fees of a Chief Restructuring Officer, to be proposed) and declines to disclose whether the Debtor plans to service those "pre-pay" and "budget plan" customers to whom it owes money (and who certainly will not pay for fuel), is insufficient.

21.     Moreover, the Debtor's budget is simply not credible.  It seems unlikely, for instance, that the Debtor will not accrue any non-payroll operating expenses such as fueling, maintenance or insurance expenses on account of the more than a hundred vehicles the Debtor uses to deliver fuel and service heating equipment, lease expenses to access fuel terminal properties and utility and vendor costs related to operating the Debtor's office.  Nor does the Budget provide for the accrual of fees of the Debtor's proposed Chief Restructuring Officer or insider salaries, which the Debtor indicates were "suspend[ed] temporarily" but not eradicated.  Motion at 5.

22.     As these administrative expenses accrue unpaid and the Debtor quickly depletes its inventory, accounts receivable and cash, the prospect of its successful reorganization fades away, leaving the Debtor's estate with fewer assets and burdened with a new layer of debt.

23.     Having failed to arrange for DIP financing, the Debtor essentially asks the Court to compel Sprague to finance its operations offering only a replacement lien on collateral the Debtor itself expects will diminish as it pursues unknowable sale options.  This protection is inadequate and the Budget makes clear that the Debtor can offer no further protection.

24.     Though the Debtor asserts that the reorganization value is appropriate in considering Sprague's adequate protection, the Debtor's own projected financial performance

demonstrates that absent a quick sale, the Debtor's business cannot be maintained as a going concern. The Debtor submits that it has cut operating costs by temporarily suspending salaries to insiders and that it has increased efforts to collect aged receivables, but its cash flow projections demonstrate these changes are insufficient to stem the tide of the businesses losses.

25. As to the likelihood of a sale, the fact that the Debtor is a large player in its market significantly limits the pool of potential purchasers. Considering that the Debtor declared to Sprague that it initiated its sale efforts this past summer, but has yet to firm up an offer, the likelihood of a sale of the business as a whole versus piecemeal liquidation seems quite slim. In addition, other than Sprague's collateral, there is little to purchase but for the assumption of pre-paid contracts, budget plan agreements and a declining and substantially unserved customer list that will bring little cash into the bankruptcy estate. The Debtor has proposed a scaled down version of its prior business model that resulted in a debt of $4.7 million to Sprague and $7.6 million to others who stand unidentified in the voluntary petition. As to the latter, the proposed budget is evidence of the fact that the Debtor has no means of satisfying obligations due those customers to whom it is indebted, and indeed no apparent intent to do so.

26. Sprague submits that a liquidation value may be more appropriate where the Debtor has yet to arrange a sale (which will take additional time to close) and time is running short. Assuming a liquidation value, Sprague's fully secured position would be substantially less certain. Given that uncertainty, the replacement liens the Debtor offers are insufficient protection. And, whether reorganization or liquidation value is assumed, the Debtor projects diminution in the value of Sprague's equity cushion for which the Debtor should provide adequate protection beyond mere replacement liens. But the Debtor can offer no more.

27. In short, the Debtor lacks the financial wherewithal to provide adequate protection of Sprague's interests and survive chapter 11. Accordingly, the Court should decline the Debtor's request to compel Sprague (and, effectively,) creditors and home heating fuel consumers to finance the Debtor's operating losses and bear significant risk of loss where the Debtor has no credit, no sale option on the table and no other means to reorganize.

Wherefore, Sprague requests that the Court enter an order denying the Motion and grant such other and further relief as is just and proper.

                Respectfully submitted,

                Sprague Operating Resources, LLC

                By its attorneys,
                Pierce Atwood LLP

Dated: November 13, 2014        By: /s/ Lawrence M. Edelman
                                            Lawrence M. Edelman, BNH #01568
                                            One New Hampshire Avenue
                                            Suite 350
                                            Portsmouth, NH 03801
                                            (603) 433-6300
                                            ledelman@pierceatwood.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of November, 2014, a copy of the foregoing Objection to Debtor's Emergency Motion for Order Authorizing Use of Cash Collateral and Provision of Adequate Protection served on all parties appearing through the ECF system, including but not limited to the following:

- William S. Gannon    bgannon@gannonlawfirm.com, jarquette@gannonlawfirm.com; mjoyce@gannonlawfirm.com; bvenuti@gannonlawfirm.com
- Office of the U.S. Trustee    USTPRegion01.MR.ECF@usdoj.gov
- Peter C.L. Roth    peter.roth@doj.nh.gov, laura.maynard@doj.nh.gov

/s/ Lawrence M. Edelman
Lawrence M. Edelman
BNH #01568